Sandford *v.* Halsey.

---

## SANDFORD *vs.* HALSEY.

The plaintiff being the owner of land which was under incumbrances, entered into an agreement under seal executed by himself and by several others, by which the whole property was estimated at $115,000, and was to be divided into *twenty-three* shares of $5000 each, the subscribers, except the plaintiff, to be *severally* interested in the shares set opposite to their *respective* names, and he to be at liberty to subscribe for two shares, and each of the subscribers to pay the amount of their shares respectively in certain instalments and to give their notes and bonds therefor. The title of the land was to be conveyed to a trustee for the

Sandford *v.* Halsey.

benefit of the subscribers, and it was *to be managed and conveyed as a majority
of the subscribers should direct, each share to be entitled to a vote.* The plaintiff
was to pay off the incumbrances out of the money to be received by him for the
property, and if he should fail to do so, the liens were to be satisfied out of the
proceeds of the first sales, and the subscribers were to have credit towards their
subscriptions for their *respective* shares of the proceeds thus appropriated; the
interest of the *respective* subscribers to be retained by the trustee as a security to
the plaintiff for the *several* notes and bonds given for the shares.    The defendant
subscribed for *one* share, and *eighteen* only of the remaining shares were sub-
scribed. In covenant against the defendant for an instalment on his subscription,
he having refused to give his bond, *held* that it was not a condition of the
agreement that the whole *twenty-three* shares should be subscribed, and that the
defendant was liable notwithstanding only a part had been subscribed.

If the parties had contemplated that the execution of the agreement should not be
complete until the whole number of shares had been subscribed, any subscriber
might make it binding on himself though all the shares had not been subscribed
by consenting to an absolute delivery.    *Per* WALWORTH, *Chancellor.*

In covenant on an agreement the declaration need not set out the whole agree-
ment, but only such parts as relate to the breaches assigned.

ON error from the supreme court.    The plaintiff in error
brought covenant in the supreme court upon certain articles of
agreement in the following words:

"Whereas, Lewis H. Sandford, of Skaneateles, in the county
of Onondaga, and state of New-York, is seized in fee, and pos-
sessed of the several tracts, pieces and parcels of land, situate
in the village of Oswego, and in the town of Oswego, in the
county of Oswego, and state aforesaid, set forth and described
in the schedule hereunto annexed; the title to the whole of
which land is now vested in the said Lewis, except as otherwise
stated in the said schedule.

And whereas, the said Lewis H. Sandford has proposed and
agreed to divide the said lands into twenty-three shares, of five
thousand dollars each, estimating the value of the same in the
aggregate, free and clear from all incumbrances, at one hundred
and fifteen thousand dollars; and to sell the said property at
that price, to such persons as shall subscribe for said shares,
reserving to himself the right of subscribing two shares of the
said property.

And whereas, the undersigned have severally each for him-

self, and not jointly, agreed to become interested in the purchase of the said property at the said price, to the extent of the number of shares set opposite to their respective names.

Now, with a view, among other things, of regulating the terms and manner of payment for the said property, the manner in which the title thereof is to be taken, held, and disposed of, and of defining the respective rights and duties of the said Lewis, and of the subscribers in regard to the said property : it is hereby declared to be mutually understood, stipulated, and agreed upon, by and between the said Lewis and the subscribers, in manner following, viz :—

*First.* The terms of payment for the said property shall be as follows : Ten per cent. to be paid on the first day of September next, with interest. Fifteen per cent. to be paid on the first day of November next, with interest. Twenty per cent. on the first day of April next, with interest. The three above payments to be provided for in the notes of the respective subscribers, payable as above. The balance, fifty-five per cent., to be secured by the several bonds of the subscribers payable to the said Lewis, with interest, on the first day of April, in each year, on the whole balance due, in instalments, as follows, viz : Twenty per cent. on the first day of April, 1838. Twenty per cent. on the first day of April, 1839. Ten per cent. on the first day of April, 1840, and five per cent. on the first day of April, 1841. The condition of the respective bonds shall refer to this instrument, and be subject to the provisions herein contained ; and the said bonds are to be delivered to the trustee hereinafter named, to be held by him as security for the discharge by the said Lewis of the incumbrances on the said premises, as herein stipulated by him.

*Second.* The title of the said property shall be conveyed to Edward Sandford, of the city of New-York, to be held in trust for the benefit of the subscribers, according to the amount of their several and respective interests therein, and subject to the agreements concerning the same, contained in this instrument.

*Third.* The notes, payable as above, on the first days of

Sandford v. Halsey

November and April next, shall be delivered to the said Lewis as soon as the conveyances of the said property (or two-thirds thereof in value,) shall be made to the said Edward Sandford. trustee as aforesaid, in regular and due form of law.

*Fourth.* The said property shall be managed, sold, and conveyed, at such time, in such manner, and for such prices as a majority of the *subscribers* shall direct, each share being entitled to a vote.

*Fifth.* The said Lewis agrees that he will act as agent in the management and disposition of the said property, without compensation, except for professional services, and for necessary disbursements. He further agrees that out of the moneys to be received by him for the said property, he will pay off and discharge all the incumbrances thereon.

*Sixth.* In case the said Lewis shall not discharge the said incumbrances, or any part of the same on request of the said trustee, as he has above stipulated, then the said incumbrances, or such part of the same as is not thus discharged, shall be paid out of the first sales of the said property which shall be made, and the subscribers shall be entitled to have credited on their several bonds, the rateable part and proportion of all such sum or sums of money as the said trustees shall so pay out of the proceeds of said sales on that account, which the parties in interest would have been entitled to, and ought and would have received of the said trustee, in respect of their respective shares and interests in the trust premises, if the said sum or sums so applied by him the trustee, to the discharge of the said incumbrances, had been paid by the said Lewis and not by the said trustee, which credit shall be endorsed by the said trustee, on the said several bonds; and when so endorsed shall be deemed and held as a discharge of so much of the principal of the said bonds, and the several obligors shall only be held, liable for the balance due thereon respectively, after the said endorsement shall have been made thereon as aforesaid.

*Seventh.* The interest of the respective subscribers shall be held and retained by the said trustee, as a security for the said Lewis, for the payment of the said several notes and bonds,

(subject as to the said bonds to the provisions of the last preceding article,) and no subscriber or his heirs, representatives or assigns, shall be entitled to any part of the proceeds of any sale or sales, whether money or securities, until the amount agreed to be paid to the said Lewis for the said property shall be fully received by him, or until the incumbrances on the property shall be first satisfied and discharged, and the balance of the said purchase money paid to the said Lewis, according to the above provisions in regard thereto.

In witness whereof, the said Lewis and the said subscribers have hereunto set their hands and seals the first day of July, in the year one thousand eight hundred and thirty-six."

The suit was commenced in July term, 1838. The declaration set forth the recital and the several provisions contained in the articles to and including the *second* general head, which provides for the conveyance of the property to Edward Sandford, as trustee ; and avers that the defendant " signed and sealed the said articles of agreement and set one share opposite to his name so subscribed thereto." It also avers that the plaintiff had, by several conveyances, executed in August and September, 1836, conveyed the property mentioned in the schedule annexed to the articles, to Edward Sandford according to the agreement. *Breach*, that the defendant had not executed or delivered to the trustee his, the defendant's bond for fifty-five per cent. the balance for his share of the property, which was by the articles to be secured in that way, and that he had not paid twenty per cent. parcel of the fifty-five, which was to be secured by such bond, which was payable the 1st day of April, 1838, nor the year's interest on the whole fifty-five per cent. which became payable on the same day. The defendant pleaded *non est factum*, and gave notice of special matter to be given in evidence.

On the trial which took place at the Oswego circuit in June, 1842, before GRIDLEY, C. Judge, the plaintiff, in order as he said, to prove the execution of the articles of agreement by the defendant, gave in evidence the exemplification of an enrolled decree in

the court of chancery in a suit by the present defendant as complainant against the plaintiff and Edward Sandford. The bill was filed in February, 1839, and its general object was to enjoin the further prosecution of this suit and to restrain proceedings at law by the present plaintiff against the complainant on the agreement, and to have the same set aside on the ground, among others, that the complainant's signature to the articles had been obtained by fraudulent representations respecting the cost to the present plaintiff, and the value of the property in question and the incumbrances upon it. A copy of the articles of agreement was annexed, by way of schedule, and the bill stated that the complainant had signed and *become a party* to the agreement. The defendants put in several answers to the bill, and the complainant filed a replication. The chancellor referred the cause to the vice-chancellor of the *second* circuit, before whom it was heard in September, 1840, who made an order dismissing the bill with costs.

The plaintiff also proved the signature by the defendant to the agreement. It was then in the hands of Edward Sandford, as the agent for the plaintiff; and the defendant, after signing the same handed it back to E. Sandford. The plaintiff also proved the signatures to the agreement of several other persons, with a statement of the number of shares which they respectively took in the premises. The defendant's signature was the last in order of signing, and the whole number of shares subscribed, including the one annexed to the defendant's name, was *nineteen.* The plaintiff also proved that the defendant had paid the first payment of ten *per cent.* mentioned in the agreement, and had given his notes for the second and third payments of fifteen and twenty per cent. which notes, after some indulgence extended to him, had been paid; and that he had accepted the declaration of trust executed to him by E. Sandford, and had attended a meeting of the subscribers for shares held pursuant to notice, for the purpose of agreeing upon a partition of the premises mentioned in the agreement. The plaintiff also gave in evidence three letters written by the defendant to the plaintiff in the summer and autumn of 1837, in

Sandford *v.* Hasley.

each of which the defendant spoke of his having become one of the association—of being interested in the speculation—and of having acquired title to the property. The object of the letters was to ask the plaintiff to release him from his obligations, on the ground that he was without pecuniary means to fulfil them. A portion of the foregoing evidence, and particularly the proceedings in chancery and the evidence of the signatures of the other subscribers for shares, was objected to when offered, but the circuit judge permitted the same to be given provisionally, in order to prove the execution and delivery of the agreement.

The plaintiff's counsel then offered the agreement in evidence and proposed to read the same, to which the defendant's counsel objected on the ground of a variance between the agreement and the declaration. The variance was alleged to consist (1) in the omission to set out the remaining provisions of the agreement, and especially the *fifth* clause; (2) that the agreement in its legal effect contained a condition that no subscriber should be liable to make any payment until the whole twenty-three shares were subscribed, and that there was no averment in the declaration that such shares had been subscribed for, or of any waiver of that condition ; (3) that there was no averment that any one had subscribed the agreement except the defendant, though the instrument offered in evidence purports to be subscribed by several others, and also that the agreement so offered in evidence would not support the declaration or show any right of action; and that independently of the question of variance, the agreement could not be received in evidence as it did not show subscriptions for more than nineteen shares, whereas it required that to be effectual the whole twenty-three shares ought to be subscribed.

The circuit judge being of opinion that the questions thus raised had been determined by the supreme court against the plaintiff, decided not to receive the agreement in evidence, and accordingly excluded the same. The plaintiff excepted. The plaintiff's counsel then called the judge's attention to the several matters given in evidence, including the proceed-

ings and decree in chancery, which he insisted were a ratification of the agreement, if a ratification were needed, and also operated by way of estoppel to prevent the defendant's denying his liability; but the judge persisted in his decision to exclude the evidence, and upon the motion of the defendant's counsel nonsuited the plaintiff, who again excepted.

At the May term of the supreme court, 1843, the plaintiff moved for a new trial on a bill of exceptions, which was refused, and upon that occasion the following opinion was given by,

NELSON, C. J. There can be no doubt but that, if it was competent for the defendant, by his acts and declarations resting in parol, so to alter and modify the agreement in question, as to make it a contract subsisting and valid between him and the plaintiff, or between the nineteen subscribers, including himself and the plaintiff, the evidence tendered at the trial went full to this effect. For he has not only signed and delivered the instrument for the purposes therein declared, but has since, repeatedly, recognized and acknowledged its validity, with full knowledge of the deficiency in the subscription of the number of shares into which the property was divided.

We must, therefore, take the execution and delivery of the articles of agreement, to be absolute and unconditional; and must assume that every thing has been done on the part of the defendant which it was legally competent for him to do by parol, in order to waive and dispense with any stipulations or conditions inconsistent with his separate individual liability, and to have consented and agreed to become absolutely bound to perform the contract, without regard to any deficiency as to the number of shares subscribed for. All this is abundantly established.

But the contract in this case, is an agreement relating to the sale of real estate, and by the statute "every contract, &c., for the sale of any lands, or any interest in lands, shall be void, unless the contract, or some note or memorandum, &c., be in

Sandford v. Halsey.

writing, and subscribed by the party." If then, the consent of the defendant to become bound to perform his part of the agreement, notwithstanding the whole number of shares into which the property was divided was not taken up, involves a variation and alteration of the original contract, so that the one sought to be enforced, rests partly in writing, and partly in parol, nothing is clearer than that it cannot be upheld. To allow a modification or alteration to be made, either expressly by words, or implied from the acts of the parties, would be in direct contravention of the provisions of the statute, and would let in all the evils intended to be guarded against by its enactment. The case of *Goss* v. *Lord Nugent*, (5 *Basn. & Adol.* 58,) aptly illustrates the operation and effect of the act upon a contract relating to lands modified in this way. There the defendant was informed by the plaintiff, after the contract had been entered into, that there was a defect of title as to one of the lots included in the contract of sale, and in respect to which, with the others, a good title was to have been given. He concluded to accept it, however, notwithstanding the defect, and possession was delivered accordingly. Afterwards he refused to complete the purchase, and an action was brought, the plaintiff relying on the parol waiver, in proof of fulfilment on his part. This was objected to, on the ground that oral evidence was inadmissible, the action being brought to charge the defendant upon a contract for the sale of lands, and the statute of frauds requiring the whole agreement to be in writing. The court, after advisement, held accordingly, and observed that the object of the statute was, to exclude all oral evidence as to contracts for the sale of lands, and that the one sought to be enforced, must be proved by writing only; that the written contract was not the one claimed to be in force; that it was a new contract which the parties had entered into, and which was to be proved, partly by the former written agreement, and partly by the new verbal agreement, and not a contract, therefore, entirely in writing.

In *Stowell* v. *Robinson*, (3 *Bing. N. C.*, 928,) the question was, whether the day for the completion of the purchase of an

interest in land inserted in a written contract, could be waived by a parol agreement, and another day substituted in its place, so as to bind the parties. The court held that it could not. They say, " we cannot get over the difficulty which has been pressed upon us, that to allow the substitution of the new stipulation, as to the time of completing the contract by reason of the subsequent parol agreement between the parties to that effect, in lieu of a stipulation as to time, contained in the written agreement signed by the parties, is virtually and substantially to allow an action to be brought on an agreement relating to the sale of lands, partly in writing, and signed by the parties, and partly not in writing, but by parol only, and amounts to a contravention of the statute of frauds." To the same effect is *Harvey* v. *Grabham*, (5 *Ad. & El.* 61,) *Stead* v. *Dawber*, (10 *id.* 57,) and many other cases that might be cited.

Now, if the evidence before us, presented simply the case of parol conditions, annexed to the delivery of the articles of agreement at the time of their execution by the defendant, either in express terms or to be tacitly implied from what appeared upon the face of the contract, importing that other persons were to become parties before it was to go into complete effect, such conditions forming no part of the contract itself, it would, doubtless, be entirely competent for the party to waive them by parol; and his subsequent acts and declarations would be admissible and pertinent for the purpose.

But if, before effect and operation can be given to the instrument against the party signing and delivering it, some of the stipulations and conditions contained in the body of the agreement must be waived, altered or modified, so that the contract reduced to writing and signed by the parties, is not the one sought to be enforced, but a new agreement, made up partly of the written agreement, and partly of the new parol agreement, then it is most obvious that the intervention of the statute, which requires that the whole must be in writing, signed by the party charged, renders it null and void.

We have, heretofore, had the contract in question before us, and were then called upon to give a construction to its terms and

conditions, and the true legal effect of the same; and without again going over the reasons assigned for our views of it, will content ourselves with briefly stating the conclusions at which we arrived.(a)   They were, 1. That according to its true legal import and effect, the plaintiff agreed to sell, and the subscribers to buy the whole of the property embraced in the articles of agreement, at the price and upon the terms therein specified, and not a part or parcel of it; and that each subscriber took and was bound to hold his share, as a part purchaser of the whole of the property in conjunction with the subscriber or subscribers of the residue of the twenty-three shares, and not separately or independently of them; that to a limited extent, and for purposes distinctly specified in the body of the agreement, and which constitute material and important stipulations and conditions between the subscribers, they had agreed to become joint purchasers of the whole interest and estate.   2. That according to its true legal import and effect the only power belonging to the owners over the property, for all the purposes of managing, selling, or otherwise disposing of it, was conferred upon and vested in the twenty-three shareholders, each share to have a vote, and a majority to govern ; and that without the representation of the several shareholders, in the mode and manner thus prescribed, the contract was a dead letter incapable of execution. Every shareholder took his interest in the property subject to the exercise of this joint power of disposition and control—and the subscription of the whole number of shares was therefore an indispensable condition of the contract itself, clearly written upon the face of it.   3. That according to its true legal import and effect the personal security of each and every of the twenty-three shareholders was pledged separately, to the extent of their shares, for the payment of the purchase money; that this was a material and important stipulation in the contract, as the whole of the property sold remained in the hands of the trus-

(a) The case of *Sandford* v. *Handy* (23 *Wend.* 260, 25 *id.* 275, *S. C.*) was an action upon this agreement against another subscriber, and the opinions there reported show more fully the reasons of the supreme court.

tee, collaterally pledged as a common security for the ultimate payment of the whole of this money.

The effect of the provision, in short, is this. Each subscriber stands personally holden for his share of the purchase money, separately, not jointly, which in the aggregate covers the whole amount, ($115,000;) but their several interests in the property itself, are jointly holden. A subscription of the whole number of shares, therefore, is a material condition of the contract, as it secures the personal responsibility of the subscribers for the whole amount of the purchase money. Any number short of this, diminishes in that proportion the personal security, and consequently increases the burden upon the land, and of course upon the several interests of each shareholder in the same.

The subscription of the whole number of shares, therefore, as clearly implied on the face of the agreement, constituted a very material part of it, and deeply affected the separate interest of each subscriber.

We need only add, that if we were right in this view of the articles of agreement, when they were formerly before us, then the defendant cannot be made liable for his share of the purchase money, without the plaintiff first showing a waiver of that part of the agreement, providing for the subscription of the twenty-three shares; and as the agreement is one relating to the sale of lands, upon the statute and authorities already referred to, it is not competent for him to prove such waiver by parol. The contract cannot rest partly in writing and partly in parol, but must be wholly in writing.

I am of opinion, therefore, that a new trial should be denied.

Judgment of nonsuit having been rendered in the supreme court, the plaintiff sued out a writ of error.

*Samuel Stevens & George Wood*, for the plaintiff in error.

1. By the legal construction of the agreement it was not essential that the whole twenty-three shares should be subscribed in order to render the defendant liable for the share subscribed by him. There is no such provision *in terms* contained in the

instrument. The language on the contrary is that each sub-scriber agrees *severally* to take and pay for the shares sub-scribed for by him. And there is no pledge of the interest of one subscriber as a security for the engagements of the others. Each one could maintain a separate action against the plaintiff for any breach of the covenant on his part. *Poole* v. *Hill,* (6 *Mees. & Welsb.* 835; *Sheppard's Touch. by Preston,* 166.) By the scope and obvious design of the agreement it was several between the plaintiff and each of the subscribers, and it should be so construed, though there be language which lite-rally understood, would lead to a different conclusion. (*Ernst* v. *Bartle,* 1 *J. C.* 319; *Ludlow* v. *McCrea,* 1 *Wend.* 228.) Cotemporaneous acts of the parties may be resorted to, to settle the construction of an agreement; and here they conclusively show that ours is the correct view of this contract. (*Roe* v. *Ashburner,* 5 *T. R.* 168; *Baxter* v. *Browne,* 1 *W. Bl.* 973; *Peneio* v. *Judson,* 6 *Bing.* 606; *Doe* v. *Ries,* 8 *id.* 178; *Han-cock* v. *Caffyn, id.* 358; *Wilkinson* v. *Hall,* 3 *Bing. N. C.* 508; *Geddes* v. *Wallace,* 2 *Bligh,* 270; *Chapman* v. *Black,* 2 *Bing. N. C.* 187; *Shore* v. *Wilson,* 11 *Sim.* 615, *in note;* 9 *Clark & Fin.* 566, *S. C.; Attorney General* v. *Drummond,* 1 *Dru. & Wav.* 368; *Story on Partn.* 288, § 191.)

2. If it were *implied* that the whole number of shares should be subscribed to render the agreement effectual, it was a condi-tion to the perfect execution of the deed; and the defendant was competent to waive that condition, and the judge should have submitted the evidence to the jury to find whether it was not the defendant's deed notwithstanding that condition. The absolute delivery which was proved was itself a waiver of the condition. (*Elliott* v. *Davis,* 2 *Bos. & Pull.* 338; *Austen* v. *Howard,* 7 *Taunt.* 28; *Matson* v. *Booth,* 5 *Maule & Selw.* 223; *Hawkshaw* v. *Parkins,* 2 *Swanst,* 542; *Cutter* v. *Whittemore,* 10 *Mass.* 442; *Adams* v. *Bean,* 12 *id.* 137; *Scott* v. *Whipple,* 5 *Greenl.* 336; *Haskins* v. *Lombard,* 16 *Maine,* 140; *The State* v. *Bowman,* 10 *Ohio R.* 445; *Speake* v. *United States,* 9 *Cranch.* 28; *Fleming* v. *Gilbert,* 3 *John.* 528; *Lovett* v. *Adams,* 3 *Wend.* 380; *Betts* v. *Perrine,* 14

Sandford *v.* Halsey.

*id.* 219; *Vanderbilt* v. *Eagle Iron Works,* 25 *id.* 665.) If such a condition as is insisted on existed the conduct of the defendant affords abundant evidence that he waived it. A condition annexed to the *execution* of a deed is a very different thing from a condition precedent to the defendant's performance contained in the deed itself; and if it be true that such a condition as that last mentioned cannot be waived by parol, where the agreement is one which the statute of frauds requires to be in writing, the principle has no application to this case. The suit in chancery, and the decree made in that suit, preclude the defendant from now setting up this objection. The bill assumes that every necessary formality to render the agreement binding on the defendant had taken place, and this is an admission that the defendant cannot retract. If necessary the court will hold it to be an admission that the deficient shares had been subscribed on a separate paper. All questions upon which the defendant's liability depended might have been litigated in the chancery suit. It therefore bars this defence. (*Le Guen* v *Gouverneur,* 1 *J. C.* 436; *Gardner* v. *Buckbee,* 3 *Cowen,* 120; *Burt* v. *Sternburgh,* 4 *id.* 559; *Torrey* v. *Bank of Orleans,* 9 *Paige,* 659; *Hopkins* v. *Lee,* 6 *Wheaton,* 109 *Cowen & Hill's Notes,* 957.)

3. There was no variance. A plaintiff is not bound to set out the whole of the agreement on which he brings his action. It is sufficient for him to set out so much as constitutes the agreement, for the breach of which he complains. (*Henry* v. *Cleland,* 14 *John.* 400; *Gordon* v. *Gordon,* 1 *Starkie's Rep.* 235.) If the agreement contains matters in discharge of the defendant's liability, he should crave oyer and plead such matters. In an action on a sealed instrument the consideration need not be stated. The only issue here was *non est factum;* and if the plaintiff proved enough to entitle the agreement to be read, which he clearly did, he could not be nonsuited, whatever the opinion of the court might be as to the effect of the instrument. (*Safford* v. *Stevens,* 2 *Wend.* 158.)

4. If there was a variance, inasmuch as there was no pretence of surprise, it should have been disregarded. (2 *R. S.* 328, § 99.)

*C. P. Kirkland & B. F. Butler,* for the defendant. 1. It is conceded that the agreement produced was the deed of the defendant, and the evidence which was given to prove, as was said, its execution and delivery, was superfluous and irrelevant. The condition insisted on was a condition not to the delivery but to the binding effect of the agreement upon the defendant. It was an indispensable condition and an integral term of the contract itself, that the whole twenty-three shares should be subscribed before the association became complete and the defendant became liable to pay any thing. (*Sanford* v. *Handy,* 23 *Wend.* 260; 25 *id.* 475, *S. C.; Quick* v. *Stuyvesant,* 2 *Paige,* 84; *Chitty on Cont.* 19, 20 ; 2 *Kent's Com.* 2d ed. 554.)

2. A plaintiff is bound to set out the contract on which he sues according to its legal effect. Here, the defendant's covenant depending by the true construction of the contract, upon the condition that all the shares should be subscribed, ought to have been so set out in the declaration; or else those parts of the agreement from which the condition appears should have been set forth. The declaration is also defective in not averring performance of the condition referred to. (*Arch. Civil Pl.* 2d *Am. ed.* 84; *Yelv.* 96; 1 *Chitty's Pl. ed.* 1840, 120, 304, 305, 308, 367; *Jones* v. *Barkley, Doug.* 684, 690; *Campbell* v. *Jones,* 6 *T. R.* 570; *Cunningham* v. *Morrell,* 10 *John.* 203 ; *Jones* v. *Gardner,* 10 *id.* 266.)

3. There was a variance in the attempt to set out the consideration of the defendant's promise. Only a portion of the consideration is stated, whereas the whole should have been set forth, if the plaintiff undertook to state it at all. (1 *T. R.* 447 ; 2 *Barn. & Ald.* 765 ; 4 *M. & S.* 470; 11 *East,* 633 ; 3 *Stark. Ev.* 1595 ; 1 *Chit. R.* 518; 9 *East,* 188; 6 *Barn. & Cress.* 430.)

4. The variances referred to are substantial and are incapable of amendment. (2 *Phil. Ev.* 146, 149 ; *Howell* v. *Richards,* 11 *East,* 633; *Tempany* v. *Burnand,* 4 *Camp.* 20; *Brown* v. *Knill,* 3 *Bro. & Bing.* 395 ; *Gordon* v. *Gordon,* 1 *Starkie's Rep.* 235; *Saward* v. *Anstey,* 2 *Bing.* 519 ; 1 *Saund.* 233, note (a); *Bircle* v. *Gibbs,* 6 *Maule & Sel.* 115; *Swallow* v. *Beaumont,* 2 *Barn. & Ald.* 765 ; *Arnold* v. *Revoult,* 1 *Bro. &*

Bing. 443; Bourne v. Freeth, 9 Barn. & Cres. 632; Foreland v. Hornigold, 1 Ld. Raym. 715; 9 Coke, 15; Maryon v. Carter, 4 Carr. & Payne, 295; 1 Ch. Pl. ed. 1840, 320 to 324; Langworthy v. Smith, 2 Wend. 587; 12 Pick. 521; Carth. 308.)

5. It was not competent for the plaintiff to show that the condition had been waived. The declaration was not on a modified agreement, but on the written contract itself as though it were absolute. Where a condition may be waived or where the performance of it may be excused, the declaration must state the facts which constitute the excuse or the waiver, and the action must be brought on the substituted agreement. But where, as in this case, the agreement is one which is required to be in writing by the provisions of the statute of frauds, it cannot rest in part in parol. The parol modifications are void. (Cowen & Hill's Notes, 1463, 1466, notes 982, 984; Littler v. Holland, 3 T. R. 590; Jewell v. Schroeppel, 4 Cowen, 564; 1 Chit. Pl. 320 to 327; Smith v. Wilson, 8 East, 437—443; Platt on Cov. 591, 595; Cook v. Jennings, 7 T. R. 381; Worsley v. Wood, 6 id. 710; Newcomb v. Brackett, 16 Mass. 161—165; Bowes v. Howe, 5 Taunt. 30; Thompson v. Brown, 7 id. 656; Glazebrook v. Woodrow, 8 T. R. 366; Heard v. Wadham. 1 East, 619; Stagg v. Munro, 8 Wend. 399; Hotham v. The E. India Co., 1 T. R. 638; Ferry v. Williams, 8 Taunt. 62; Stevens v. Cooper, 1 John. Ch. R. 425; Goss v. Nugent, 5 Barn. & Adolph. 58; Harvey v. Grabham, 5 Adol. & Ellis, 61; 6 Mea. & Wels, 109; Blood v. Goodrich, 9 Wend. 68; Stowell v. Robinson, 3 Bing. N. C. 928; Stead v. Stephenson, 10 Adol. & Ellis, 57; 2 Steph. N. P. 1999.)

THE CHANCELLOR. The equity of this case is clearly with the plaintiff; and if the defendant succeeds in defeating his recovery, it must be upon some technical ground, merely, which neither of the parties thought of while there was a prospect that the agreement to purchase a share in the Oswego property would be a beneficial one to the defendant. Both parties had proceeded to carry the agreement into effect, in part, as a valid

and binding agreement upon both.    The plaintiff executed the
deed of trust in conformity to the agreement, and caused a decla-
ration of such trust to be delivered to the defendant in Septem-
ber, 1836; who received the same and paid the ten per cent.
upon his subscription, and gave his notes for the payments which
were to become due on the first of November and the first of April
then next ensuing.   Having by this part performance of the agree-
ment secured to himself the full benefit of it in case it had proved
a profitable speculation, and deprived the plaintiff of the power of
selling the land to another while its price remained undiminished
in the market, the loss by the subsequent depreciation of the
property certainly should in equity fall upon the defendant.

I confess that upon examining the agreement, I cannot discover
any thing from which it can reasonably be inferred that the
subscription of the whole number of shares or of twenty-one
shares was intended to be made a condition precedent to the
right of the defendant to claim the benefit of the contract, or the
right of the plaintiff to demand a performance on the part of the
defendant.   As I understand the contract, the interests of the
several subscribers were to be separate and distinct throughout,
except so far as they were to be governed by a majority of
voices in directing the management and the time and manner
of selling the property by the trustee to whom it was to be con-
veyed for the benefit of the several owners according to their
respective interests therein.   The proposition as contained in
the agreement, is not an offer to sell the whole of his land
or none of it; nor is it to sell twenty-one shares of it or
none.   But it is a proposition to sell it to such persons as
may think proper to enter into the contract with him, in shares;
each share consisting of one twenty-third part of the property at
the rate of $5000 a share; estimating the whole property at
$115,000.   And the subscribers, each for himself, severally and
not jointly, agreed to become interested in the purchase of the
property at that price; that is, at the price of $5000 a share, to
the extent of the number of shares set opposite to their respec-
tive names.   The three first instalments of the purchase money
were to be secured by the notes of the *respective* subscribers,

payable at the times specified in the agreement. The residue was to be secured by the several bonds of the subscribers, which bonds were to be delivered to the trustee, to be held by him as security that the plaintiff would discharge the incumbrances upon the premises which he had assumed to pay. And if he did not pay the incumbrances, the trustee was to pay the same out of the first sales which should be made; and the rateable proportion of each subscriber in such proceeds thus applied was to be credited to such subscriber on his bond, as a payment thereof *pro tanto.* The evident meaning of this part of the agreement was not that the proceeds of the property of one subscriber should be applied to pay the bond of another; but it was merely to secure the faithful application of the purchase money paid by each subscriber to the extinguishment of the incumbrances which the plaintiff assumed the payment of; so that it should not be diverted to any other object. In the same manner the *seventh* clause of the agreement pledges the interests of the *respective* subscribers, as security to the plaintiff, for the payment of their *several* notes and bonds. The late chief justice is clearly under a mistake in supposing that the subscribers were in any event to stand as security for each other. It is evident that he has fallen into this error by supposing that the lien of the plaintiff upon the share of each subscriber for the purchase money of his share or shares of the land, was fully provided for in the first part of the *seventh* article of the agreement; and that the subsequent clause of that article must have been intended to pledge the shares of all the subscribers in the proceeds of the sale for the payment of the purchase money due from each. Upon a careful examination of this seventh article, however, it will be seen that the first clause was only intended to secure a lien upon the share of each subscriber in the land itself in the hands of the trustee before a sale, for the payment of the purchase money due to the plaintiff from the owner of that share; and that the subsequent clause of the same article, was intended to secure a similar lien, not on the land itself in the hands of the trustee, but upon the interest of the several subscribers in their respective shares of the proceeds of sales which the trustee

should have made from time to time. The whole contract shows that it must have been the intention of all parties that each subscriber, and the shares of the lands purchased by him, were only to be charged with the purchase moneys due upon his own shares. And it would be contrary to the whole frame and spirit of this agreement to give any construction to the last clause of this seventh article which was inconsistent with the real intention of the parties as it appears from other parts of the agreement.

The circuit judge erred in nonsuiting the plaintiff on the ground of variance. In a declaration in covenant upon an agreement, it is not necessary to set out the whole of it, but only such parts thereof as relate to the breaches assigned. And where the part of the agreement which is not set out, is not necessary to be set out for the purpose of assigning the breaches relied on, it is no variance ; and the plaintiff cannot be nonsuited on that ground. (*Henry* v. *Cleland,* 14 *John. Rep.* 400 ; *Hill* v. *Sanders,* 1 *Carr. & Payne,* 80.) Here the parts of the agreement not stated, would not give a different construction to the part of such agreement which was stated, and were therefore properly omitted in the declaration.

Even if the parties in this case contemplated that the execution and delivery of the instrument should not be complete until the whole number of shares was subscribed, they might subsequently consent to an absolute delivery upon the subscription of the nineteen shares only, so as to make it a binding agreement as to those nineteen shares. And there was abundance of evidence that the delivery as to this defendant was considered by both parties to be absolute. He could not therefore consistently with legal principles succeed upon his plea of *non est factum.* Nor was there any difficulty in carrying the agreement into effect, upon the sale of those nineteen shares only, instead of twenty-one or twenty-three shares. If the share of each subscriber was only liable for the purchase money of his share, he would have every benefit which was contemplated under the agreement. In that case, as well as in the case of the subscription of twenty-one shares, the whole legal title would

be and in fact was conveyed to the trustee named in the agreement. And the defendant had as great, if not a greater influence in the control and directions to the trustee, as he would have had if the whole twenty-three shares had been subscribed by persons other than the plaintiff. And he would be entitled to his full share of the proceeds of his undivided portion of the premises upon paying his share of the purchase money at the times it became due or upon applying it towards the incumbrances, which the plaintiff had assumed to pay, as provided for in the sixth clause of the agreement. The whole difficulty of the supreme court appears to have arisen from the erroneous supposition of the late chief justice, that the different subscribers were in some way to be holden for the payment of the purchase moneys due from their associates. And as I have no doubt such a construction of the agreement is one which none of the parties thereto ever contemplated or intended, and is contrary to its whole spirit, the ground upon which the decision of that court was based, is necessarily destroyed; and the plaintiff, upon the evidence adduced and offered upon the trial, was entitled to a verdict, and ought not to have been nonsuited. I have therefore arrived at the conclusion that the judgment was erroneous and should be reversed.

Lott, Senator. It is important to the proper determination of this case to recur to the pleadings and the proofs offered on the trial, in order to ascertain what the real question presented for our decision is.

The declaration is in covenant on articles of agreement alleged to have been executed by the defendant in error to the plaintiff in error, for the purchase of one share in certain land at Oswego, which the plaintiff in error wished to sell, and for the accomplishment of which object he divided it into twenty-three shares. To this declaration the plea of *non est factum* only was pleaded, accompanied however with a notice of certain matters of defence. But as no question arises under this notice, it is unnecessary to refer to its contents.

The only issue, therefore, for the plaintiff to sustain was the

execution of such an instrument as was declared on. The breach and every other allegation were admitted by the plea. In support of this issue the plaintiff offered to read in evidence certain articles of agreement, after introducing proof to show their execution and an absolute and unqualified delivery by the defendant. This evidence being objected to was excluded by the circuit judge and a nonsuit was thereupon ordered.

The only question, then, to be considered is whether the articles of agreement were admissible as evidence under the issue above referred to. The principal objection to their admissibility was that of a variance between them and the agreement counted on in the declaration. The validity of that objection appears to me to be the material point in this cause.

Before proceeding to the examination of that question, it may be useful to refer to the rules of law applicable to it. A substantial variance between an instrument declared on and that offered in evidence, may be taken advantage of under the plea of *non est factum.* The mere fact, however, that the whole of the instrument is not set forth is not evidence of such variance. It is well settled that the plaintiff is not obliged to set out the whole contract. It is enough for him to state so much as constitutes the agreement, the breach of which is relied on, and it is not necessary to state other parts not qualifying or varying it. (1 *Chitty Pl.* 300, *and cases there cited; Henry* v. *Cleland,* 14 *John. Rep.* 400.) A defendant may, however, show that a covenant set out, as general and absolute, is subject to a qualification or exception ; but it will not be a variance if a proviso in defeasance of a covenant, but which is not incorporated with it in a deed, be omitted. (1 *Chitty's Pl.* 301 ; 2 *Phillips' Ev.* 146, *and cases cited.*) It is also settled that in general in an action of covenant it is unnecessary to state any intermediate inducement or statement of the consideration upon which the defendant's contract was founded. (1 *Chitty's Pl.* 346, 7.) But where an act to be done by the plaintiff was the consideration of the defendant's covenant and constituted a condition precedent, it is necessary to show such consideration as well as performance. (*Id.* 351.)

Upon the application of the rules above laid down, the con· clusion is, I think, inevitable, that the agreement offered in evidence was improperly excluded, and that the nonsuit was erroneously granted.

It was conceded on the argument by the counsel of the defendant in error, that the *execution and delivery* of the articles of agreement sought to be introduced in evidence were absolute and unconditional. It was contended, however, that his *covenant* was conditional, that his agreement was to take one share if the twenty-three shares were subscribed and not otherwise, and that the subscription of the whole number of shares was " an indispensable condition and an integral term of the contract itself clearly appearing on its face." It is not pretended that there is an express condition of that nature; and a careful examination of the different provisions of this agreement will show that such is not its fair construction. The recitals explain the general object contemplated by the parties, and afford an important aid in ascertaining the true meaning of their contract.

A particular reference to the language used in them appears therefore to be indispensable. They are in the following terms : " Whereas, Lewis H. Sandford, of Skaneateles, in the county of Onondaga and state of New-York, is seized in fee and possessed of the several tracts, pieces and parcels of land situate in the village of Oswego and in the town of Oswego, in the county of Oswego and state aforesaid, set forth and described in the schedule hereunto annexed, the title to the whole of which land is now vested in the said Lewis, except as otherwise stated in the said schedule. And whereas the said Lewis H. Sandford has proposed and agreed to divide the said lands into twenty-three shares, of five thousand dollars each, estimating the value of the same in the aggregate, free and clear from all incumbrances, at one hundred and fifteen thousand dollars; and to sell the said property at that price to such persons as shall subscribe for said shares, reserving to himself the right of subscribing two shares of the said property. And whereas, the undersigned have *severally each for himself and not jointly,* agreed to become interested in the purchase of the said property at the said price, *to the*

*extent of the number of shares set opposite to their respective names."*

What was the intention of the .parties as expressed by this language?. Their object is fully declared by it. The second recital explains the end Mr. Sandford had in view. He wished to effect a sale of his land at a large price. He estimated the value of the whole, free and clear from incumbrances, at one hundred and fifteen thousand dollars, and proposed to sell it at that valuation, but upon what terms as to payments does not appear in this recital. The subsequent part of the contract, however, affords the evidence that he was to give a liberal credit for the principal portion of the purchase money. The third recital places the other parties in the position of purchasers—Mr. Sandford's price is made known to them. They desire to become interested in the purchase of the property, but the price was large and more than, it is fair to presume, was convenient to be paid in cash. That difficulty is removed by the offer of a liberal credit. Another obstacle is suggested. The operation was too heavy for them. That embarrassment is obviated by a proposition on the part of Mr. Sandford "to divide the said lands into twenty-three shares of five thousand dollars each," but reserving to himself the right of subscribing two shares of the said property. But now another impediment is to be overcome. Although an opportunity is offered thus " to become interested in the purchase of the said property at the said price," by a subscription for one, or more shares, yet the purchasers may possibly be responsible for each other's engagements. It is therefore proposed that they shall become liable "severally, each for himself, and not jointly"—"to the extent of the number of shares set opposite to their respective names."

These various propositions having been made and agreed to, seven different provisions are then "declared to be mutually understood, stipulated and agreed upon between the said Lewis and the subscribers"—"with a view among other things. of regulating the time and manner of payment for the said property, the manner in which the title thereof was to be taken,

held and disposed of, and of defining the respective rights and duties of the said Lewis and of the subscribers in regard to the said property." These provisions all show, in my opinion, that the liability of each subscriber was intended to be and is entirely distinct from that of his associates; and there is nothing indicating a qualification of that liability. The first provides for the terms of payment. The first, second and third payments were to be made "in the notes of the *respective* subscribers." The balance was "to be secured by the *several* bonds of the subscribers payable to the said Lewis"—the conditions of which were to refer to the instrument and to be subject to the provisions therein contained. These bonds were to be delivered to the trustee in whom the title was to be vested, "to be held by him as security for the discharge by the said Lewis of the incumbrances on the said premises," as stipulated by him. The second provision was in these words—"The title of the said property shall be conveyed to Edward Sandford, of the city of New-York, to be held in trust for the benefit of the subscribers according to the amount of their *several* and *respective* interests therein, and subject to the agreements concerning the same contained in this instrument." The third provision relates merely to the time of the delivery of the notes specified in it, which are not involved in the present question. The remaining provisions I will not notice at present. A more particular reference to them will hereafter become necessary.

There appear to be two branches of this agreement having no necessary connexion with each other. The first relates to the sale and purchase of the property, the terms and manner of payment and the mode in which the title was to be taken. The other concerns its management and disposition after the objects contemplated in the first branch are attained, and is embraced in the fourth, fifth, sixth and seventh stipulations or provisions. The residue of the articles is applicable to the first branch and is, with the exception of the third provision above referred to, set forth in the declaration. No question is made in relation to the notes specified in that provision. It was therefore unnecessary to set it forth.

Sandford *v.* Halsey.

The whole scope and design of the agreement, so far as above presented to us, is to provide for the sale to and purchase by the several subscribers of the shares subscribed for without reference to the fact whether they are all subscribed for or not. It is true the second and third recitals speak of the sale and purchase of the property; but they at the same time make provision for the subscribers to become interested "to the extent of the shares set opposite to their respective names." The mere fact that the plaintiff originally contemplated a sale of all the shares does not affect the rights of the other parties. Each subscriber, by his subscription, acquired an interest in the land and incurred a liability co-extensive with that interest, separate and distinct from that of every other subscriber.

In the view of the case above presented, I have considered the agreement without reference to the fourth and subsequent provisions contained in it. They relate in my opinion, as before remarked, to the sale and disposition of the property by the trustee *after* the vesting of the title in him "in trust for the benefit of the subscribers according to the amount of their several and respective interests therein," and have no relation to the contract of sale and purchase as between the plaintiff and those subscribers.

It is insisted, however, that they qualify the previous part of the agreement, and that they are wholly inoperative without a full subscription. It then becomes necessary to examine them more particularly. The fourth provision is much relied on in support of that position. It provides that "the said property shall be managed, sold and conveyed at such time, in such manner and for such prices as a *majority of the subscribers* shall direct, each share being entitled to a vote." By this, the power to manage and dispose of the property is, I concede, absolutely vested in the subscribers. There is, however, nothing in the provision to show that the exercise of it was dependent or conditional on a subscription for all the shares. On the contrary it appears to me to be well devised to obviate a difficulty which might arise in case all the shares were not subscribed for. In such an event the plaintiff would have retained not

only an interest in the portion remaining unsubscribed, but a right co-extensive with that interest in the management and control of the property. An embarrassment may have reasonably been anticipated in the execution of the scheme in consequence of the position in which the parties would be thus placed. The plaintiff, it was foreseen would, under certain circumstances, retain the entire control. His interest was different from that of the subscribers. He might (as Chief Justice Nelson well remarked in his opinion on this contract,) "stop short after the subscription of eleven shares, hold the subscribers personally liable for the fifty-five thousand dollars of the purchase money, without their having the slightest control over the property; his imaginary unsubscribed number would constitute the majority; in effect he would hold the character of both vendor and vendee. He would still retain the right to dispose of the property for such price and upon such terms as he saw fit; might part with it at once for the balance of the purchase money in despite of his associates." And I agree with him that a construction which would give the seller such advantages would be "a most unreasonable interpretation of the agreement, and should not be yielded to, except upon very explicit and positive provisions to that effect." (*Sandford* v. *Handy*, 25 *Wend.* 475.) This fourth provision was, in my opinion, admirably calculated to prevent such a result. It was manifestly proper that the purchasers should have the control in the disposition of the property; and it was also right that the plaintiff's interest in the unsubscribed shares should not be entirely unrepresented. A reservation was therefore made, giving him the privilege, at his election, of a holder of two shares only, although possessed of a greater interest. This provision accomplishes that object. It, in terms, vests the control in a majority of the *subscribers*, giving each a representation to the extent of his interest; the plaintiff, at his election, reserving to himself the rights of a subscriber for two shares. It appears to me, however, to afford no countenance to the idea that "the shares must necessarily be first taken by the subscribers before they can fulfil the duties imposed on them." On the contrary, I think it con-

tains intrinsic evidence that it was clearly in contemplation of the parties that, there might not be a subscription for all the shares, and it certainly, fully and most effectually protects the rights and interests of the purchasers.

The last provision was also much relied on to support the construction given to the. agreement by the supreme court. It provides that "the interest of the *respective subscribers*.shall be held and retained by the said trustee as a security for the said Lewis *for the payment of the said several notes and bonds*, (subject as to the said bonds to the provisions of the last preceding article,) and no subscriber, or his heirs, representatives or assigns, shall be entitled to any part of the proceeds of any sale or sales, whether money or securities, until the amount agreed to be paid to the said Lewis for the said property shall be fully received by him, or until the incumbrances on the property shall be first satisfied and discharged, and the balance of the said purchase money paid to the said Lewis according to the above provisions in regard thereto." It had previously been provided that the payment of forty-five per cent. of the purchase money should be made "in the notes of the *respective subscribers*," and that "the balance, fifty-five per cent." should "be secured by the *several* bonds of the subscribers," to be delivered to the trustee and "held by him as security for the discharge by the said Lewis of the incumbrances on the said premises" as stipulated by him.

Provision was also made to secure the purchasers against those incumbrances by vesting the title of the property in a trustee for their benefit, and authorizing the payment thereof (if not discharged by the plaintiff) or any portion remaining unsatisfied out of the proceeds of the first sales; and it was declared that upon such payment the subscribers were entitled "to have credited on their several bonds, the rateable part and proportion of all such sum or sums of money as the said trustee should pay out of the proceeds of said sales on that account, which the parties in interest would have been entitled to and ought and would have received of the said trustee in respect of their *respective shares and interests* in the trust premises, if the said sum or

sums so applied by him, the trustee, to the discharge of the said incumbrances had been paid by the said Lewis, and not by the said trustee," which credit was to be endorsed by the said trustee on the said *several bonds*, and when so endorsed was to be deemed and held as a discharge of so much of the principal of the said bonds, and the *several obligors* were only to be held liable for the balance due thereon *respectively* after such endorsements should have been made thereon.

The seventh provision above recited was then added. Its object was clearly to give the plaintiff a lien on the shares of the respective subscribers in the land itself until a sale and in the proceeds thereof after it. The share of each subscriber was, however, in my opinion, only chargeable with the payment of his individual note or bond, and I think there is no foundation for the claim that this clause amounts to an equitable mortgage upon the property for the whole amount payable by all the subscribers, or for the argument, that no subscriber was to be entitled to any portion of the proceeds of sale, until the whole purchase money was paid to the plaintiff either in money or in part liquidation of the incumbrances.

It must be borne in mind that a strict regard is had in the previous provisions of the agreement to the several and distinct interests of the respective subscribers. An express direction is given that a rateable part and proportion of the payments out of the first sales of the property shall be endorsed on their *several bonds*. Then the clause in question commences with the declaration that " the interest of the *respective subscribers* shall be held and retained by the said trustee as a security for the said Lewis for the payment of the *said several* notes and bonds." It is conceded by the supreme court that this part of the clause provides for a separate lien and pledges the separate interest of each for the payment of his share only; but it is insisted that " the succeeding part is more general and forbids payment of any portion of the proceeds till the whole purchase ey has been satisfied." Such a construction would lead to palpable inconsistency. A subscriber, on the payment of ote and bond before the sale, would have an interest in

the land discharged from this equitable lien, but as soon as it was converted into money by a sale then this lien would again attach.   A fair interpretation of the whole clause together will not justify such a conclusion.

In giving a construction to this provision the court below have apparently overlooked (for they do not notice it) a portion of the concluding part of it which appears to me to limit its operation so as to make the latter branch of the clause in harmony with the previous part.   It does not absolutely forbid the payment of the proceeds till the whole purchase money has been paid, but it declares that no subscriber "shall be entitled to any part of the proceeds of any sale or sales, whether in money or securities, until the amount agreed to be paid to the said Lewis for the said property shall be fully received by him, or until the incumbrances on the property shall be first satisfied and discharged and the balance of the said purchase money paid to the said Lewis, *according to the above provisions in regard thereto.*"   Thus, this article or clause is connected in its operation and is to be construed in connexion with previous provisions, which distinctly recognize the separate rights and liability of each subscriber.

But even if the latter branch of the clause in question, standing alone and disconnected, would admit of the construction put upon it by the supreme court, yet it is subversive of all rules of interpretation to separate it from its context.   In looking at the provision as one and entire, and examining its general scope and object, it appears to me evident that in declaring that no subscriber "shall be entitled to receive any portion of the proceeds of any sale or sales," &c. "until the amount agreed to be paid to the said Lewis for the said property shall be fully received by him," it has reference to the amount to be paid by *such subscriber*.   The interest of the *respective* subscribers and the payment of their *several* notes and bonds had been particularly referred to in the first part of this provision, and the parties, in speaking of the amount to be paid had reference, in my judgment, to such notes and bonds only.   Particular caution is manifested in the previous part of the agreement against a joint

liability. The subscribers severally, each for himself and not jointly, agreed to become interested in the purchase of the property to the extent of the shares set opposite to their respective names, and had made special provision for payment therefor " in their several notes and bonds." If each subscriber's share could, under the seventh clause, be held liable for the whole purchase money agreed to be paid by all of them, it is evident that the parties became interested and responsible far beyond the extent contemplated by them.

Covenants are to be construed according to their spirit and intent, and when from the subject matter it is the clear intention of the parties that they should be taken distributively they may be so taken, although there be no express words of severalty. (See *Ernst* v. *Bartle*, 1 *John. Ca.* 319 ; *Quackenboss* v. *Lansing*, 6 *John. Rep.* 49 ; *Ludlow* v. *McCrea*, 1 *Wend.* 228.)

This whole agreement affords intrinsic evidence of great precaution in clearly defining the rights and liabilities of the respective parties ; and from its general scope and object it is evident that each subscriber intended to be liable only for his own subscription. That intent should be carried into effect ; and if even the language of the seventh clause justified the construction put on it by the supreme court, yet it ought not to prevail against that intent.

Upon the whole it appears to me, after full consideration, from the whole scope and design of the agreement, that the defendant was bound by his subscription for a share of the property, and became liable for the payment of the same, although the whole number of shares was not subscribed for.

This view of the case is consistent with the acts and conduct of the parties themselves ; and if it be conceded that in the construction of an agreement no attention ought to be paid to the acts of the parties or to the interpretation they may have put upon it, yet when those acts are in harmony with a fair construction of the agreement itself, it affords strong moral evidence of its truth and justice. If I am correct in these conclusions as to the true meaning of this contract, there was no variance between

the declaration and proof offered. It is unnecessary therefore to examine the other questions raised on the argument.

The evidence offered having been improperly excluded, the judgment below ought to be reversed and a new trial ordered.

*Senator* BARLOW also delivered an opinion in favor of reversing the judgment of the supreme court, concurring essentially in the views presented in the foregoing opinions.

PORTER, Senator. A very important question, if not the controlling one in this case is, whether the legal construction of the articles of agreement offered in evidence required that the twenty-three shares should all be subscribed before the defendant's covenant became obligatory. I have examined the articles with care, and have also weighed all the arguments offered by the eminent counsel for the plaintiff against this construction; but I cannot resist the conviction that the only sensible construction of this instrument, taking it as a whole, required that the twenty-three shares should be subscribed in good faith, before the defendant would be bound by his covenant.

The legal import of the instrument must depend upon the terms used by the parties; and every part of it should be considered in the effort to ascertain their meaning. Their intent as thus expressed, or plainly implied from what is expressed, and from the nature of the agreement, if consistent with the rules of law, must be enforced by the courts. To determine the point in controversy, it is important to understand the general scope of the articles, and also the particular provisions contained in them. To these objects I will therefore address myself.

The plaintiff owned certain real estate in Oswego, which was valued by him at $115,000, but which was incumbered. This he proposed to divide into twenty-three shares of $5000 each; and to sell the same to such persons as should subscribe the articles; reserving two shares for himself. The subscribers were to *purchase severally*, and not *jointly*, and to the extent of the number of shares subscribed by each; so that each one had a several interest, to the extent of the right secured by the

articles. He had not a separate interest in any certain portion of the premises ; for the whole of the premises were holden, as will hereafter appear, for the payment of the whole purchase money; though he was personally holden to pay only such portion of the whole sum as his share or shares amounted to.

The agreement plainly contemplated a sale of the whole property to the associates including the plaintiff's two shares. It provides for " regulating the terms and manner of ˙payment for the property;" not for such shares as should be subscribed. Also for " the manner in which the title thereof should be taken, held, and disposed of, and of defining the respective rights and duties of the said Lewis and of the subscribers in regard to said property." Also, that " the title of said property shall be con veyed to a trustee to be held for the benefit of the subscribers." And again, " that the said property shall be managed, sold and conveyed at such time, and in such manner as a majority of the subscribers shall direct." " That out of the moneys received by the plaintiff for the said property he will pay off and discharge *all* the incumbrances thereon."

All these provisions of the articles of agreement contemplate a sale of the whole property ; and they cannot be satisfied unless the whole is embraced in all the future arrangements made in respect to the objects of the several parties. Again, it is provided that the bonds to be given by the subscribers, to secure to the plaintiff fifty-five per cent. of the purchase money, " shall be delivered to the trustee, to be held by him as security.for the discharge *by the said Lewis* of the incumbrances on the said premises ;" showing further that the subscribers intended to provide that the whole premises described in the agreement should be cleared of all the incumbrances by the plaintiff. If it was not certain that the subscribers contemplated the purchase of the whole, why should they be careful to provide for paying all the incumbrances ? If any portion less than the whole had entered into the minds of the parties, some appropriate regulation would have been inserted to meet such an event. But there is nothing of the kind in the articles of agreement. And still further to show that nothing less than the

sale of the whole property was admissible within the view of the parties, the last clause declares, that "no subscriber, or his heirs, representatives, or assigns, shall be entitled to any part of the proceeds of any sale or sales, whether money or securities, until the amount agreed to be paid to the said Lewis for 'the said property, shall be fully received by him, or until the incumbrances on the property shall be first satisfied and discharged, and the balance of the said purchase money paid to the said Lewis, according to the above provisions in regard thereto." Here, therefore, we find it expressly stipulated that although the subscribers had paid for their shares in full, still no part of the avails of the sales of the property were to be refunded to them, until the whole sum of $115,000 and the interest thereon should be received by the plaintiff, except such portion as should be applied to the discharge of the incumbrances. Unless the subscription of the whole number of shares was contemplated and effected, and the whole property thereby sold, the result would be, that the proceeds of the sales of the shares actually subscribed would be made applicable to the payment of the whole sum of $115,000; and the subscribers would be entitled to receive no part of those proceeds, until that debt with its interest should be fully paid: thus compelling them to pay for land which they had never agreed to purchase, and which the plaintiff had never agreed to sell to them, and to which they would have no title, except that arising out of an involuntary payment of its price. If, therefore, it shall be insisted that a subscription of any less number than twenty-three shares or a sale of the whole premises, was within the view and intention of the parties, it seems to me that the conclusion to which I have arrived, repulsive as it is, is inevitable. No court, I apprehend, will give a construction to a contract that shall produce such consequences, unless driven to do so by its plain and express terms.

Other arguments, and of great force, too, might be urged, arising from the unanticipated and disproportionate influence which the plaintiff would otherwise secure to himself, and the effect which it might, and probably would have upon the inte-

rests of the subscribers, if the plaintiff was to be deemed the subscriber of the remaining shares. But I forbear from dwelling upon them, as I deem the view above expressed conclusive upon this question. I have therefore come to the conclusion, that any admissible interpretation of the contract requires that the whole property should be deemed to have been sold by the plaintiff, or in other words that the twenty-three shares should have been subscribed, before any subscriber would be bound by the covenants contained in the agreement.

But the counsel for the plaintiff insists that the proof given required the circuit judge to submit the question, whether or not this was the deed of the defendant, to the jury; and that the evidence was sufficient to justify the jury in finding that the instrument offered was his deed. That could not be a material question, unless it was assumed that the instrument offered in evidence was the one specified in the declaration. From the view I have taken of the construction of the agreement, the condition that the twenty-three shares should be subscribed, although implied, forms as essential a part of it as any express condition in it. It entered as much into the contemplation of both parties, and was as inseparable from a just understanding of the contract, as if it had been fully expressed. And the plaintiff, in declaring upon the instrument, was bound to set it out in substance, and aver a performance. The rule that an instrument should be set out according to its *substance and effect*, is not disputed. When that offered in evidence does not appear to be, in substance and effect, the one declared on, it must of course be rejected, unless the defendant by pleading *non est factum* simply, has deprived himself of the objection. The question then arises, is the variance available under this plea?

The plaintiff is always deemed to have set out the substance of the contract truly; and if the court, upon an examination of the agreement offered in evidence, shall decide that there is a substantial portion of it which he has omitted to notice, can it be said with any propriety, that he has proved the deed upon

Sandford *v.* Halsey.

which he has declared? Is it not strictly logical to say that the deed declared on is not the defendant's deed? If authority is wanted for so plain a proposition, I refer to 2 *Phill. Ev.*, 146 where he says: " The plea of *non est factum* also puts in issue this point, whether the defendant has executed a deed, of which the legal effect and substance are correctly stated in the declaration. The defendant, therefore, under this plea, may take advantage of any variance between the legal effect of the deed produced, and that specified on the record. Thus, under a plea of *non est factum*, the defendant may show that a covenant set out as general and absolute, is subject to a qualification or exception." There was, therefore, a variance between the proof and the record, and the judge was right in rejecting the proof and nonsuiting the plaintiff.

But, again, it is insisted that the defendant by his acts *in pais*, has waived the performance of this condition; and that the agreement is now to be read, as though no such condition had been contained in it. The plaintiff has declared upon the agreement, setting out certain parts of it, by which it appears that the property was to be divided into twenty-three shares; and has averred that the defendant subscribed for one share, without saying that the remainder of the shares was subscribed, but leaving that as a matter of inference. At the trial he offers the agreement in evidence, and also offers to prove by parol and other evidence, acts of the defendant by which, as he contends, the defendant had waived the condition that required the subscription of twenty-three shares. Suppose, for the present, that such evidence was competent under another state of pleadings; was it admissible under this declaration? It was an attempt to recover in covenant, upon an agreement substituted for the original contract. It was not the agreement executed by the defendant under his seal, but a very different one; and one to which the defendant might have opposed a different defence, had he been apprised by the declaration of the one he was required to answer. Without dwelling upon the point, I will refer to some authorities that would seem to settle the question. Platt in his treatise on covenants, (p. 591,) thus states the rule: " When A. cove-

nanted to convey certain lands to B., and in consideration there- of B. covenanted, upon the execution of the conveyance, to pay £1,000 ; and B. afterwards accepted of a rent charge in lieu of parts of the land, it was held that, as the conveyance was a condition precedent, and had not been executed, A. could not recover the money.   The parol agreement so substituted might be sufficient whereon to found an action of assumpsit, but it could not be the foundation of an action upon a covenant under seal, whereby the parties bound themselves to perform a differ- ent contract." In *Phillips* v. *Rose*, (8 *John.* 392,) the action was covenant on articles of agreement, to build a mill at a cer- tain place and within a certain time.   The declaration was upon that agreement.   The court held that evidence that the con- tract was altered by parol, was not admissible.   These and many other cases that might be cited, show that if the plaintiff would seek to enforce his remedy for a violation of the agreement, he should have sought it under the substituted agreement.

But there is still another objection to the parol evidence offered to show a waiver; that arising out of the statute of frauds.  This, however, is so conclusively argued by Ch. Jus- tice Nelson, in his opinion in this case, that I shall content myself with expressing my assent to his conclusions.

The judgment of the supreme court should be affirmed.

Bockee, Senator.   This case involves the construction of the agreement entered into between the plaintiff and the several shareholders, bearing date 1st July, 1836.   The positions taken by Chief Justice Nelson in the case of *Sandford* v. *Handy*, (25 *Wend.* 475,) and the views which he has given in support of those positions, appear to me to be conclusive and unanswer- able.   It is true that the subscribers are *severally* bound only to the extent of their individual shares of $5000 each.   But it is also clear that the contract was for the sale of the whole property, not of a part ; and by the seventh article in the agree- ment the interest of the respective shareholders in the property is jointly liable as well for the incumbrances as for the payment

of the whole purchase money to the plaintiff. The property and estate being so bound, the filling up of that subscription would go to diminish the extent of that liability, and if the shares were fully paid in would extinguish it altogether. The paying subscribers can receive no share of the proceeds of the sales until the whole number of twenty-three shares which are contemplated by the agreement are subscribed and paid, or unless sales should be made at a sufficient advance in price to extinguish the lien of the plaintiff. In my view it is impossible to carry this contract into effect with the subscription of less than the whole number of shares without essentially affecting the rights and interest of the parties. I conclude that it was an imperfect and inchoate contract, that the covenant was conditional, and that the defendant in error was not bound by it unless the whole of the twenty-three shares were subscribed.

Another material question is whether it was competent for the plaintiff on the trial to prove by parol that the defendant had waived the condition which appears to be necessarily implied in the covenant that all the shares should be taken. The supreme court have placed their decision of this question upon this ground; that the same policy and provision of the statute which makes void every contract for the sale of lands or any interest therein unless the same be in writing and subscribed by the party to be charged, applies equally to any alteration of the original contract. If then the plaintiff could not recover on the original contract or articles of agreement without shewing the subscriptions to have been made for the twenty-three shares, he cannot be permitted to shew that the defendant had verbally agreed to dispense with that condition. The mischiefs against which the statute was intended to guard would be open and rife if the written contract required by the statute could be altered or modified by a new unwritten agreement. The judgment should be affirmed.

On the question being put, " Shall this judgment be reversed ?" the members of the court voted as follows:

*For reversal:* The PRESIDENT, The CHANCELLOR, and *Senators* BACKUS, BARLOW, BEERS, BURNHAM, CHAMBERLAIN, CLARK, JONES, LOTT, MITCHELL, SCOVILL, SEDGWICK, SMITH and WRIGHT—15.

*For affirmance:* *Senators* BEEKMAN, BOCKEE, DENNISTON DEYO, EMMONS, FOLSOM, HAND, HARD, JOHNSON, LESTER, PORTER, SHERMAN, TALCOTT and VARNEY—14.

Judgment reversed.