(87 Misc. Rep. 610)

In re DEITZ.

In re BRADY.

(Supreme Court, Special Term, Kings County. November 24, 1914.)

1. MANDAMUS (§ 23*)—CANVASS OF ELECTION RETURNS—COMPELLING CANVASS "CANDIDATE"—"PARTY CANDIDATE"—"INDEPENDENT CANDIDATE."
 Under Election Law (Consol. Laws, c. 17) § 358, subd. 4, as amended by Laws 1913, c. 821, providing, relative to the preparation of the ballot by a voter, that, to vote for any "candidate" not on the ballot, he shall write the candidate's name on a line left blank, in the appropriate place, a person so voted for is a "candidate," within section 381, authorizing the issuance of a writ of mandamus upon the application of any candi-

date for a recount of the votes on ballots protested as marked for identification, or to determine whether any ballot and the votes thereon rejected as void shall be counted, notwithstanding section 3, subd. 18, as added by Laws 1911, c. 891, defining a "party candidate" as a person selected by a party to be its candidate for an office authorized to be filled at a general or special election, or at a town meeting, and subdivision 19, defining an "independent candidate" as a person selected by an independent body to be its candidate for an office authorized to be so filled.

[Ed. Note.—For other cases, see Mandamus, Cent. Dig. §§ 55–58; Dec. Dig. § 23.*

For other definitions, see Words and Phrases, First and Second Series, Candidate.]

**2. ELECTIONS (§ 159\*)—BALLOTS—RIGHT TO VOTE FOR OFFICES OMITTED.**

Though the election officials fail to provide on the official ballot an appropriate place to vote for an office, a vacancy in which should be filled at an election, and though no voter applies to the Supreme Court or a justice thereof for an order requiring the correction of such error or omission, as authorized by Election Law, § 344, voters are not thereby deprived of their right to have the names of candidates' for whom they vote, by writing their names upon the official ballot, canvassed and counted in favor of such person.

[Ed. Note.—For other cases, see Elections, Cent. Dig. § 124; Dec. Dig. § 159.*]

**3. MUNICIPAL CORPORATIONS (§ 124\*)—ALDERMEN—VACANCIES—CONSTITUTIONAL AND STATUTORY PROVISIONS—"ELECTIVE OFFICER."**

Under Greater New York Charter (Laws 1901, c. 466) § 1586, vesting in the aldermen of the city of New York all of the powers and duties of the several boards of supervisors theretofore existing, not transferred to administrative departments, bureaus, etc.; article 36 of the first state Constitution (1777), providing that nothing therein shall annul any charter to bodies politic made prior to the date it became effective; article 29 of such Constitution, providing that supervisors and other officers theretofore eligible by the people, should continue to be so eligible as directed by the Legislature; provisions of subsequent Constitutions, recognizing supervisors as constitutional officers; and Const. 1894, art. 3, § 26, providing for supervisors in each county not wholly included in a city, and that in a city including an entire county the powers and duties of such board may be devolved upon the municipal assembly, common council, or board of aldermen; and in view of the inherent powers and duties of aldermen of the city of New York, as provided in its charter and recognized in all of the Constitutions of the state—an alderman is an "elective officer," though the aldermanic district is in the county of Kings, and not within the territory constituting the city of New York prior to the enactment of the Greater New York Charter; and hence section 18 of that charter, providing that any vacancy among the members of the board of aldermen shall be filled by election by a majority of the members elected thereto, and that the person so elected to fill any such vacancy shall serve for the unexpired portion of the term, is invalid, so far as it provides that a person so elected to fill a vacancy shall hold office for a longer term than until January 1st following, under Const. art. 10, § 5, providing that in case of elective offices no person appointed to fill a vacancy shall hold his office by virtue of such appointment longer than the commencement of the political year next succeeding the first annual election after the happening of the vacancy.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 290–297; Dec. Dig. § 124.*

For other definitions, see Words and Phrases, First and Second Series, Elective Office.]

4. MUNICIPAL CORPORATIONS (§ 124*)—ALDERMEN—ELECTION OR APPOINTMENT
   —CONSTITUTIONAL AND STATUTORY PROVISIONS.
        Under article 36 of the first state Constitution (1777), providing that
   nothing therein shall annul any charter to bodies politic made prior to
   the date of such Constitution, the right of the inhabitants of the city of
   New York to elect their aldermen is a constitutional right, which the Leg-
   islature cannot impair.
        [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§
   290–297; Dec. Dig. § 124.*]      .

Two applications, by Karl S. Deitz and by Philip Brady, candidates
voted for at the election held on November 3, 1914, for writs of man-
damus. directed to the Board of County Canvassers of Kings County,
requiring it to perform its duty in the manner prescribed by law in the
canvass of votes cast for the office of alderman from the Fifty-Second
and Fifty-First aldermanic districts, respectively, of the City of New
York.  Peremptory writ granted on each application.

John D. Mason, of New York City (Robert L. Luce, of New York
City, of counsel), for petitioners.

Harry E. Lewis, of Brooklyn, for August Ferrand.

William W. Colné, Frank L. Polk, Corp. Counsel, of New York
City, and Charles J. Druhan, Asst. Corp. Counsel, of Brooklyn, for
board of county canvassers.

Francis X. Carmody, of New York City, amicus curiæ.

BENEDICT, J.  These are two applications arising upon orders
requiring the board of county canvassers of Kings county and the in-
spectors of election comprising the boards of election in certain election
districts of the Tenth and Eleventh assembly districts of Kings county
and of the Fifty-First and Fifty-Second aldermanic districts of the
city of New York to show cause why peremptory writs of mandamus
should not issue, directed to the said board of canvassers and the said
inspectors of election, requiring them to canvass the votes cast in the
Tenth and Eleventh assembly districts of Kings county and the Fifty-
First and Fifty-Second aldermanic districts of the city of New York
for the office of alderman from the Fifty-First and Fifty-Second alder-
manic districts, and to count and canvass the votes that were cast at
the general election held on November 3, 1914, for the petitioners, Karl
S. Deitz and Philip Brady, for the office of alderman in said districts
respectively, and to make a return of the votes so cast.

These two applications were argued and submitted to the Special
Term together upon November 20, 1914, and the facts involved in each
application were practically the same, and there were no issues of fact
arising upon the applications, but only questions of law, which were
identical.  The admitted facts which are submitted to the court in these
applications are briefly as follows :

At the general election held on November 4, 1913, one Ardolph L.
Kline was elected as an alderman from the Fifty-First aldermanic dis-
trict of the city of New York for a term of two years, beginning on
January 1, 1914; and at the same election one Daniel R. Coleman
was elected as alderman from the Fifty-Second aldermanic district

of the city of New York for a similar term. Each of the persons so elected duly qualified and entered upon the office of alderman from his respective district.

Upon the 5th day of January, 1914, the said Ardolph L. Kline duly resigned his said office, and thereby a vacancy was created in the office of alderman from the Fifty-First aldermanic district of the city of New York. Upon the 25th day of June, 1914, the said Daniel R. Coleman died, and thereby a vacancy was created in the office of alderman from the Fifty-Second aldermanic district of the city of New York.

The affidavit submitted by August Ferrand states that:

"Deponent was elected to the place made vacant by the said Ardolph L. Kline for the unexpired portion of the term."

The affidavit submitted by William W. Colné states that:

"Deponent was elected on June 30, 1914, to the place made vacant by the said Daniel R. Coleman for the unexpired portion of the term."

It will be noticed that the answering affidavits of Messrs. Ferrand and Colné contain no statement that either of them was "duly" elected to fill the vacancy created as aforesaid, nor do they state in what manner such election was brought about. No point was, however, raised by the petitioners upon the argument as to this informality of statement, and the case was presented upon the theory that they were elected to fill the vacancies in the manner provided by section 18 of the Greater New York Charter (Laws 1901, c. 466), which provides as follows:

"Any vacancy which may occur among the members elected to the board of aldermen shall be filled by election by a majority of all the members elected thereto, of a person who must be of the same political party as the member whose place has become vacant; and the person so elected to fill any such vacancy shall serve for the unexpired portion of the term."

On behalf of the petitioners, however, it is claimed that the two vacancies thus created must be filled at the next general election occurring after a vacancy, to wit, at the general election held on November 3, 1914, and that the person receiving the highest number of votes for the said office of alderman in each of said aldermanic districts at such general election would be entitled to hold said office for the unexpired term of the said Kline and Coleman, respectively, from January 1, 1915, until December 31, 1915.

The petitioners do not dispute the fact that Messrs. Ferrand and Colné are now severally holding the office of alderman, and they do not raise any question as to the legality of such holding. Indeed, they recognize in their petitions that Messrs. Ferrand and Colné are, by virtue of holding the office of alderman, respectively, members of the board of canvassers of Kings county (see paragraph ninth of petitions).

The petitioners claim that vacancies were in the manner hereinbefore stated created in the offices of alderman from the said Fifty-First and Fifty-Second aldermanic districts which were to be filled at the general election held on November 3, 1914, and they further show, on information and belief, that at the election held upon that day votes were cast for these petitioners for aldermen from the said districts,

respectively, to fill the said vacancies by persons voting in a number of the election districts of the said Tenth and Eleventh assembly districts who would be entitled to vote for alderman in said Fifty-First and Fifty-Second aldermanic districts, and they show, further, the sources of their information as to the casting of such ballots. They allege that all of the votes cast in said districts for the office of alderman were cast for these petitioners in their respective districts. It developed on the argument that these petitioners believe that such votes were cast by voters writing the name of the respective petitioner on the ballots with a designation of the office. They allege further that the election inspectors in the election districts in which such ballots were cast for the petitioners did not count the said ballots for the petitioners for the office of alderman, nor make any record thereof in the return of the said election districts, but placed the same in the envelopes for void and protested ballots.

Upon these facts the petitioners base their application for a peremptory writ of mandamus directing the board of county canvassers of Kings county to canvass and count the said ballots thus voted for the petitioners for the office of alderman in their favor and to declare the petitioners to be duly elected as aldermen in the Fifty-First and Fifty-Second aldermanic districts of the city of New York, respectively, for terms severally beginning on January 1, 1915, and expiring on December 31, 1915.

On behalf of the board of county canvassers John Diemer states in his answering affidavit that no votes were canvassed in the Fifty-First and Fifty-Second aldermanic districts for aldermen, for the reason that no return statement or tally sheet showing that any such votes were cast or canvassed for aldermen in said aldermanic districts were received by the said board of county canvassers from the inspectors of election for districts within said aldermanic districts, and that no election to fill a vacancy in the office of aldermen in the said aldermanic districts was called to be held on November 3, 1914, and that no nomination for said office of alderman in said districts was made by any political party or by any independent certificate of nomination or otherwise prior to said election.

[1] The counsel for Messrs. Ferrand and Colné at the outset raised a preliminary question concerning the right of the petitioners to maintain these proceedings. He claims that the petitioners are not "candidates" within the meaning of the provisions of section 381 of the Election Law (Consol. Laws, c. 17), and therefore are not entitled to the relief asked for. He contends that a candidate under the provisions of this statute must be either a "party candidate" or an "independent candidate," which are defined in section 3, article 1, subdivisions 18 and 19 of the act, as added by Laws 1911, c. 891, as follows:

"18. The term 'party candidate' or 'party nominee' means a person who is selected by a party * * * to be its candidate for an office authorized to be filled at a general election, or at a special election held to fill a vacancy in such office, or at a town meeting."

"19. The term 'independent candidate' or 'independent nominee' means a person who is selected by an independent body to be its candidate for an office authorized to be filled at a general election, or at a special election held to fill a vacancy in such office, or at a town meeting."

If the Election Law contained no other provisions than those just quoted, I should be inclined to take the counsel's view of this question, but it was plainly the legislative intent not to limit the voters to voting only for such persons as had been officially certified to the board of elections either as candidates of a political party or as candidates under independent nominations. This is plainly shown by the provisions of subdivision 4 of section 358 of the Election Law, as amended by Laws 1913, c. 821, which provides as follows:

"4. To vote for any *candidate* not on the ballot, he shall write the candidate's name on a line left blank in the appropriate place."

It is evident from this provision that the legislative intent was to consider a person whose name was thus written as a candidate, although not named as a candidate on the ballot. I think it must undeniably follow that, if there were in fact a vacancy in the office of alderman in the Fifty-First and Fifty-Second aldermanic districts to be filled at the general election in 1914, any person whose name was written upon the ballot in the manner specified in section 4 would be entitled to have such votes counted in his favor, and therefore would be entitled under those circumstances to maintain a proceeding of this nature under section 381.

[2] But the learned counsel for Messrs. Ferrand and Colné goes a step further in his argument upon this preliminary question, and contends that, because there was no appropriate place provided upon the ballot in which votes for the office of alderman in these aldermanic districts could be cast, the qualified voters had no right to vote for candidates for the office of alderman.

While it is true that the Election Law provides in section 344 a method by which errors and omissions in ballots may be corrected by direction of the court upon the application of any voter, I think it is clear under the authorities that the failure of a voter to make such an application does not result in his disfranchisement to vote for any office at a general election in respect of which there is a vacancy which should be filled. As it seems to me, this proposition must be regarded as settled by the decisions of the Court of Appeals in the cases of People ex rel. Goring v. President, 144 N. Y. 616, 39 N. E. 641, and People ex rel. Hirsh v. Wood, 148 N. Y. 142, 42 N. E. 536. In the Goring Case Judge Gray said (144 N. Y. page 619, 39 N. E. 642):

"If the clerk, or other officer, charged with the duty, neglect to print upon the official ballot the name of an office, which, under the law, was to be filled at the election for which the official ballots were prepared, the qualified voter will not, thereby, be deprived of his constitutional right to vote for any person he chooses for such an office."

The conclusion I think is inevitable that if in fact a vacancy in the office of alderman in the two aldermanic districts in question did exist, which should properly have been filled at the election in 1914, the failure, neglect, or omission of the election officials to provide a place on the official ballot for voting for such office did not deprive the voters of their right to have the names of the candidates for whom they voted, and whose names they wrote upon the official ballot, canvassed and counted in favor of such persons.

[3, 4] This therefore brings us to the question whether vacancies did exist in the office of alderman in the two aldermanic districts in question which the qualified voters in those districts had the right to fill at the late election. It is contended on behalf of the petitioners that the office of alderman of the city of New York is a constitutional office.

In the consideration of this question it may not be improper to divide the subject into two parts, the first of which would naturally fall under the head of a review of the offices of alderman of the city of New York and supervisor of the county of Kings in their historical bearings, and the second would be the ascertainment of the constitutional recognition and treatment of the offices and the judicial construction of such treatment. I regret exceedingly that the very limited time which I have been able to devote to the historical treatment of the question at issue (less than 48 hours) does not admit of as full an exposition of the subject as its interest and importance demand, but this is to be regretted the less as the subject has been so admirably treated by Chancellor Walworth (People v. Mayor of New York, 25 Wend. 9), by Chancellor Kent (Notes on the Charter of the City of New York, 1836), and by Surrogate Fowler (infra).

It may, however, not be amiss to note that from the earliest period in the history of the city of New York there have been officials bearing the title of aldermen who were elected by the qualified voters of the city and who exercised the law-making power on behalf of the inhabitants of the city. It is true that the territory now embraced in the aldermanic districts as to which this question has arisen was not originally embraced within the limits of the city of New York as those limits existed before the enactment of the Greater New York Charter; but the legislative power and functions of the board of supervisors in the county of Kings were for all practical purposes similar to those vested in and exercised by the board of aldermen of the former city of New York, and upon the formation of the present city of New York all of the powers and duties of the several boards of supervisors theretofore existing in any of the territory of the city of New York, and not transferred to or devolving upon administrative departments, bureaus, commissions, officers, or other functionaries were vested in the board of aldermen of the city of New York (section 1586 of the Greater New York Charter).

As will hereafter be noted, the office of supervisor in the county of Kings was established or recognized as existing as early as the year 1691. In respect of the aldermen of the city of New York, we find that although from the year 1621, when the States General of Holland made a grant of the country to the West India Company, and in 1624, when the first government of New Amsterdam was established by the appointment of Peter Minuet as director, with a council of five, in whom the supreme executive and legislative authority in the colony was placed, there were various abortive attempts on the part of the colonists who were sent over from Holland to settle in "the new and unknown world" to obtain some measure of self-government in regard to their local affairs, it was not until the year 1652 that the directors of the company granted to New Amsterdam a municipal gov-

ernment consisting of "one schout, two burgomasters, and five schepens to be elected by the citizens in the manner usual in this city of Amsterdam." The model furnished by the city of Amsterdam consisted of a board or college, and in this was vested the right to make all city laws and ordinances (O'Callahan, Hist. p. 210). The right, however, of the municipal body so constituted for New Amsterdam to frame laws for the city was not immediately allowed, and it was not until 1656 that the burgomasters of Amsterdam issued conditions for the settlement of New Amsterdam according to an agreement with the West India Company whereby it was provided that the "fortified place allotted for the residences of the colonists, whether we call it a city or town, respecting the police or administration of justice, and especially the matter of descents, shall be regulated in the same manner as here in Amsterdam." Hoffman's Treatise on the Corporation (1st Ed.) pp. 15 to 20.

Immediately after the conquest of New Amsterdam by the English, August 27, 1664 (O. S.), Colonel Nicolls, Deputy Governor of the Duke of York, by an ordinance declared:

"That the inhabitants of New York, New Harlem and all other his majesty's subjects inhabiting upon the island commonly called and known by the name Manhattan Island, are and forever shall be accounted, nominated and established as one body politique and corporate under the government of the mayor, aldermen and sheriff."

Judge Fowler, in his Notes and Observations accompanying the Grolier Club reprint of the Laws of New York, says (page 121):

"This ordinance is now known as the first charter of the city of New York, but it was so meager that it came to be regarded as a confirmation of prior municipal franchises and privileges. In 1673–1674 the city was again under the control of the military forces of the States General, and a quasi civil authority of the Dutch type was restored under the former designation of schout, burgomasters, and schepens. Fifteen months later the city was ceded again to the English under the treaty of Westminster. They proceeded to revive the English civic administration. * * * In 1683 the city was divided into wards."

The first formal charter granted to the inhabitants of the city of New York was that conferred upon them by Governor Thomas Dongan on April 22, 1686. In the preamble to this charter it is recited:

"And whereas divers lands, tenements and hereditaments, jurisdictions, liberties, immunities and privileges have heretofore been given and granted or mentioned to be given and granted to the citizens and inhabitants of the said city, sometimes by the name of schout, burgomasters and schepens of the city of New Amsterdam and sometimes by the name of the mayor, aldermen and commonalty of the city of New York, sometimes by the name of the mayor, aldermen and sheriff of the city of New York, sometimes by the name of the mayor and aldermen of the city of New York and by divers other names as by their several letters patent, charters, grants, writings, records and immunities amongst other things may more fully appear."

This charter appointed six citizens to be "the present aldermen of the said city," and provided that they, with the mayor, recorder, and assistant aldermen, should constitute the common council of the said city, with power to make laws and ordinances for the government of the said city; and it was further provided that upon the feast day of St. Michael the Archangel yearly one alderman, one assistant alder-

man, and one constable for each respective ward should be chosen by a majority of voices of the inhabitants of each ward. These provisions were practically continued by the Montgomerie Charter of 1730.

By reference to the first edition of the Laws of the Colony of·New York, printed by William Bradford in 1694, it appears, at page 43, that the mayor, aldermen, and commonalty of the city of New York for the time being in common council assembled were empowered to make ordinances regulating the laying out of new roads, for buildings, for regulating traffic and commerce, by providing for the "control and erection of buildings, streets, lanes, wharffs, docks, and allyes so that all impediments and obstructions that may retard the work may be removed." They were by the same act given powers of taxation, the removal of nuisances in the public streets of the city, the manner and order of paving the streets, regulation and placing of sewers, drains, and vaults, and to exercise the right of eminent domain for the acquisition of land required for public uses.

This important statute, which was passed by the Colonial Governor and Council with.the representatives in General Assembly, was confirmed by the Privy Council on May 11, 1697. See Acts of Assembly, printed by Baskett, London, 1719, page 9. This act was unrepealed and unamended down to the time of the Revolution. See Van Schaack's Laws, vol. 1, page 8, printed in 1774.

The provisions of the Charter of the City of New York were, as is well known, expressly preserved in the first Constitution of the state of New York which went into effect under the Convention Ordinance of May 8, 1777, section 36 of the Constitution providing:

"That nothing in this Constitution contained shall be construed to affect any grants of land within this state, made by the authority of the said king or his predecessors, or to annul any charter to bodies politic by him or them, or any of them, made prior to that day, and that none of the said charters shall be adjudged to be void by reason of any nonuser or misuser of any of their respective rights or privileges between the 19th day of April, in the year of our Lord one thousand seven hundred and seventy-five, and the publication of this Constitution."

And so the right of the inhabitants of the city of New York to elect their aldermen became, by the adoption of the state Constitution, a constitutional right which the Legislature cannot impair.

Turning now to the history of the board of supervisors, we find that the county of Kings was erected by an act passed by the Colonial Legislature November 1, 1683, which contained this provision:

"Kings county to contain the several towns of Bushwick, Bedford, Brooklyn, Flatbush, Flatlands, New Utrecht and Gravesend, with the several settlements and plantations adjacent."

This act appears from the transcript of the journal in Documents Rel. to Col. Hist. N. Y. III, 304, to have been received by the Board of Trade October 17, 1684. On May 13, 1691, an act was passed providing for the annual election in each respective town of two freeholders, who were empowered to assess a rate upon the inhabitants within their respective towns and deliver that rate upon a certain day "to a certain freeholder which shall be likewise chosen in each respective town aforesaid to supervise and examine the public and necessary

charge" of each respective county. This act was repealed by an act of the General Assembly passed October 18, 1701, which transferred the powers of the supervisors to the justices of the peace of the respective counties, but the repealing act expressly preserved the right of the common council of the city of New York to raise and levy the necsary public charges yearly and every year. By an act passed on the 19th of June, 1703, it was again provided that supervisors should be elected in each respective town. This act conferred the usual powers upon the board of supervisors in relation to the public expenses and funds, and it contained a provision that in case of a vacancy occurring by death or resignation or otherwise the inhabitants of the town or county should proceed to a new choice for the remaining part of the year. This act was confirmed by the privy council May 20, 1708 (see Baskett, p. 69), and it continued in force until the Revolution.

By article 29 of the first Constitution of the State (1777) above referred to, it is provided that:

"Supervisors * * * and all other officers heretofore eligible by the people shall always continue to be so eligible in the manner directed by the present or future acts of the Legislature."

By chapter 64 of the Laws of 1788 the counties of the state were divided into towns, and it was provided that the freeholders and inhabitants of each of the said towns for the time being respectively who are or shall be°qualified by law to vote at town meetings shall forever hereafter have full power and authority, and they are hereby directed and required to assemble together and hold town meetings in their respective towns on the first Tuesday in April in every year, and then and there to elect and choose one supervisor. See the act printed in Louden, pp. 136 et seq., and Jones & Varick, vol. 2, pp. 319, 333.

Supervisors continued to be recognized as constitutional officers by the second Constitution of the state, effective December 31, 1822. See section 7, art. 4, and section 15 of that article, which provided that "all officers heretofore elective by the people shall continue to be elected."

This Constitution continued in force until the adoption of the Constitution of 1846, and it was said in People ex rel. Wood v. Draper, 15 N. Y. 532–539, that by the Constitution of 1846 all county offices which before its adoption had been filled by the votes of the people continued to be elective offices and the supervisors by article 10, section 2 of that Constitution were specifically mentioned and referred to. Section 23 of article 3 of this Constitution as amended 1874, provided:

"The Legislature shall, by general laws, confer upon the boards of supervisors of the several counties of the state such further powers of local legislation and administration as the Legislature may from time to time deem expedient."

The same provisions were continued .in the Constitution of 1875 (article 10, § 2).

By the Constitution of 1894 (article 3, § 26) it was provided that:

"There shall be in the several counties, except in cities whose boundaries are the same as those of a county, a board of supervisors to be composed of such members and elected in such manner and for such period as is or may

be provided by law. In any such city, the duties and powers of a board of supervisors may be devolved upon the common council or board of aldermen thereof."

And it was provided in article 10, § 5:

"The Legislature shall provide for filling vacancies in office, and in case of elective officers, no person appointed to fill a vacancy shall hold his office by virtue of such appointment longer than the commencement of the political year next succeeding the first annual election, after the happening of the vacancy."

It was further provided by section 6 of said article 10:

"The political year and legislative term shall begin on the first day of January."

In reference to the provision of the sections last quoted it was held in People ex rel. Howard v. Supervisors of Erie County, 42 App. Div. 510, 59 N. Y. Supp. 476, in a case where the facts were quite similar to those in the present proceedings, that the office of supervisor was an elective office, which must be filled by the qualified voters, and that where during his term of office a supervisor duly elected died, and the common council of the city of Buffalo, acting under the authority conferred by its charter, duly elected a successor in his stead, that such successor could not hold office after the 1st of January next succeeding the next general election, although under the provisions of the charter he would have had the right to hold such office for the balance of the unexpired term of the person in whose stead he was appointed. The Appellate Division of the Fourth Department, the late Justice McLennan writing, said:

"Article 10, § 5, of the Constitution provides as follows: 'The Legislature shall provide for filling vacancies in office, and, in case of elective officers, no person appointed to fill a vacancy shall hold his office by virtue of such appointment longer than the commencement of the political year next succeeding the first annual election after the happening of the vacancy.' The Constitution further provides that the political year shall begin on the 1st day of January. We think the two sections above referred to dispose of the question under consideration, and it follows that the section of the charter above quoted is clearly in contravention of the section of the Constitution."

The court further says:

"Article 12, § 3, of the Constitution, emphasizes the contention of the relator. That section, which provides for the election of supervisors and other officials in odd-numbered years, expressly exempts from its terms officials elected to fill vacancies. We think, considering the provisions of the Constitution above quoted, that it is apparent that it was the purpose of the framers of the Constitution to prohibit the Legislature from depriving the electors of a town or ward in a county of the right of having a voice in the selection of its supervisor for a longer term than until the next general election, after which the office of supervisor elected by such electors should become vacant by death, resignation or otherwise. If any other construction be given to the provisions of the Constitution, it would be competent for the Legislature, by prescribing a long term of office for supervisors of counties in case of vacancies, to reorganize such boards by appointment rather than by vote of the electors."

This decision was unanimously affirmed upon the opinion just referred to in the Court of Appeals (160 N. Y. 687, 55 N. E. 1099).

The Constitution of 1894 was amended in article 3, § 26, on November 7, 1899, so as to provide as follows:

"There shall be in each county, except in a county wholly included in a city, a board of supervisors, to be composed of such members and elected in such manner and for such period as is or may be provided by law. In a city which includes an entire county, or two or more entire counties, the powers and duties of a board of supervisors may be devolved upon the municipal assembly, common council, board of aldermen or other legislative body of the city."

As has already been noted, the powers formerly exercised by the board of supervisors in the county of Kings have in fact devolved upon the board of aldermen of the city of New York, and by virtue of the provision last quoted and other provisions of the present Constitution of the state, and by virtue of the inherent powers and duties of the office of alderman of the city of New York as provided in its charter and as preserved and recognized in all of the Constitutions of the state of New York, the alderman must be held to be a constitutional officer elective by the qualified voters of the aldermanic district. See Constitution, art. 3, § 5; article 3, § 26; article 3, § 28; article 10, § 2; article 12, § 3; Rathbone v. Wirth, 6 App. Div. 311, 40 N. Y. Supp. 535; Judge Herrick's opinion, affirmed 150 N. Y. 539, 45 N. E. 15, 34 L. R. A. 408, where it is said:

"Common councils and boards of aldermen of cities are constitutional bodies; that is to say, they are governmental bodies, recognized by the Constitution. See article 3, §§ 26, 28; article 12, § 2. And as referred to and recognized in the Constitution, it must be assumed that they were referred to and recognized with their then existing powers and authority."

Therefore I am forced to the conclusion that the provision in the Greater New York Charter providing for the filling of a vacancy in the office of alderman by appointment by a majority of the members of the board of aldermen is valid only in so far as the holding of the office by such appointee extends to the 1st day of January next succeeding the appointment, and that in so far as it provides for a longer term for such appointee it contravenes the provision of the Constitution of this state and is in that respect invalid. Had I any doubt as to the correctness of the conclusion just stated I should feel constrained to resolve such doubt in favor of the petitioners in these proceedings, in view of the decision of the Court of Appeals in the case of People ex rel. Wogan v. Rafferty, 208 N. Y. 451, 456, 102 N. E. 582, in which case the Court of Appeals unanimously held:

"Where the Constitution establishes a specified office, or recognizes its existence, and prescribes the manner in which it shall be filled, the Legislature may not transfer any essential function of the office to a different officer chosen in a different manner. Warner v. People, 2 Denio, 271, 272, 281 [43 Am. Dec. 740]. The authority of the Legislature to regulate the duties of constitutional officers to some extent has frequently been recognized by the courts, but not to the extent of depriving them of a substantial attribute of the office. As was said by Chancellor Walworth in the case cited: 'When the Legislature, as in this case, assumes the power to take from a constitutional officer the substance of the office itself, and to transfer it to another who is to be appointed in a different manner and to hold the office by a different tenure than that which was provided for by the Constitution, it is not a legitimate exercise of the right to regulate the duties or emoluments of the office, but an infringement upon the constitutional mode of appointment.'"

The application for the peremptory writ in each of these proceedings is therefore granted as a matter of right, and not in the exercise of discretion; but, as the question is novel in so far as it applies to the city of New York, it should be without costs.